1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBERT BROWN,

                            Plaintiff,

        v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                            Defendant.

Case No. C09-5225RJB-KLS

REPORT AND RECOMMENDATION

Noted for April 23, 2010

        Plaintiff, Robert Brown, has brought this matter for judicial review of the denial of his

application for disability insurance benefits.  This matter has been referred to the undersigned

Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as

authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing

the parties' briefs and the remaining record, the undersigned submits the following Report and

Recommendation for the Court's review.

                    FACTUAL AND PROCEDURAL HISTORY

        Plaintiff currently is 53 years old.[1] Tr. 35.  He has a high school – and some additional

vocational – education, and past relevant work experience as a machinist. Tr. 31, 323-24.

        On February 3, 2005, plaintiff filed an application for disability insurance benefits,

alleging disability as of September 21, 2001. Tr. 16, 89.  His application was denied initially and

_____

        [1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding
Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference
of the United States.

REPORT AND RECOMMENDATION - 1

on reconsideration. Tr. 16, 35-36, 73, 73, 78.  A hearing was held before an administrative law judge ("ALJ") on June 7, 2007, at which plaintiff, represented by counsel, appeared and testified. Tr. 316-339.  On December 21, 2007, a supplemental hearing was held, at which plaintiff, again represented by counsel, appeared and testified, as did a medical expert. Tr. 340-62.

On February 26, 2008, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)     at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)     at step two, plaintiff had "severe" impairments consisting of an organic mental impairment with a childhood history of learning difficulties and dyslexia, and marijuana abuse;

(3)     at step three, none of plaintiff's impairments met or medically equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)     after step three but before step four, plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with an additional limitation to only simple, repetitive work;

(5)     at step four, plaintiff was unable to perform his past relevant work; and

(6)     at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 16-32.  Plaintiff's request for review was denied by the Appeals Council on February 18, 2009, making the ALJ's decision the Commissioner's final decision. Tr. 5; 20 C.F.R. § 404.981.

On April 17, 2009, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3).  The administrative record was filed with the Court on July 31, 2009. (Dkt. #11).  Plaintiff argues the ALJ's decision should be reversed and remanded to the

_____

[2] The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

REPORT AND RECOMMENDATION - 2

Commissioner for further administrative proceedings for the following reasons:

     (a)    the ALJ erred in evaluating the medical evidence in the record;

     (b)    the ALJ erred by failing to find plaintiff's headaches and vertigo to be severe impairments;

     (c)    the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy; and

     (d)    the ALJ failed to properly develop the evidentiary record.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, and for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded for further administrative proceedings.

DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    The ALJ's Evaluation of the Medical Evidence in the record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where

REPORT AND RECOMMENDATION - 3

the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

REPORT AND RECOMMENDATION - 4

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190, 1195 (9th Cir. 2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

A.    <u>Dr. Gentry</u>

Plaintiff underwent a psychological evaluation performed by Rex Gentry, M.D., in mid-November, 2004. Tr. 227-31.  Plaintiff denied "feeling depressed," and although his short-term memory was noted to be "significantly impaired" in that he "did not identify the day of the week, number of the day, or month of the year" when asked, it was noted that "in filling out registration papers in the interview room, he had correctly transcribed the date," and had identified the year. Tr. 230.  Plaintiff's long-term memory "did not appear to be significantly impaired," and there was "[n]o evidence or suspicion of psychotic symptoms." <u>Id.</u>  In terms of diagnoses, Dr. Gentry found in relevant part:

> 1.    Major Affective Disorder, Unipolar Depression, Single Episode, Chronic, starting after a traumatic brain injury.  Marked degree of severity. . . . GAF [global assessment of functioning] score of 48.[3]

---

[3] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" <u>Pisciotta v. Astrue</u>, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007).  "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." <u>Pisciotta</u>, 500 F.3d at 1076 n.1 (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34); <u>Cox v. Astrue</u>, 495 F.3d 614, 620

REPORT AND RECOMMENDATION - 5

Symptoms and signs of depression reflect sequelae of trauma to brain
structures and brain functioning for both affective and cognitive dimensions[.]
      2.      Post-traumatic Stress Disorder, Chronic . . .
      3.      Traumatic brain Injury Syndrome due to MVA [motor vehicle
accident] . . .

Tr. 230-31.

Plaintiff argues that while the ALJ summarized Dr. Gentry's evaluation report, he erred by not stating what weight, if any, he was giving to the findings and opinions contained therein. See Tr. 25. Specifically, plaintiff notes the low GAF score with which he was assessed, which, as noted above, indicates serious symptoms or serious impairment in social and/or occupational functioning. The undersigned agrees the ALJ erred here. It is true that the failure to reference a GAF score in, for example, assessing a claimant's residual functional capacity "standing alone" does not make that RFC assessment inaccurate, a GAF score still may be "of considerable help" to the assessment thereof. Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002). In other words, a GAF score is "relevant evidence" of a claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007). Because it is significant probative evidence, the ALJ erred in failing to evaluate the above GAF score.

B.      <u>Dr. Lewy</u>

The medical expert who testified at the supplemental hearing, Dr. Arthur Lewy, thought the evidence in the record supported the following primary diagnoses: an "organic mental impairment"; an "apparent childhood history of learning difficulties"; some possible "mild" dyslexia; and possibly some "acquired cognitive problems from" plaintiff's 2001 automobile accident. Tr. 352. He also testified that there was a secondary diagnosis of marijuana abuse, and that it did not seem as if plaintiff had adapted or "adjusted particularly well." Tr. 352-53. In

n.5 (8th Cir. 2007) ("[A] GAF score in the forties may be associated with a serious impairment in occupational functioning.").

REPORT AND RECOMMENDATION - 6

terms of the severity of plaintiff's impairments, Dr. Lewy testified that he would "rate moderate limitations" in activities of daily living, in social functioning, and in maintaining concentration, persistence and pace. Tr. 353.  Dr. Lewy also found no episodes of decompensation. Id.

In regard to the findings of other medical opinion sources in the record indicating "significant social limitations," Dr. Lewy testified that documentation thereof, at least in relation to plaintiff's accident, was "fairly minimal." Id.  Dr. Lewy also testified that there were several inconsistencies in the record – as well as "other evidence" calling into question the credibility of plaintiff's allegations of disabling symptoms and limitations, including signs of "reduced effort" on psychological testing – although Dr. Lewy did think that "given the persistence of" plaintiff's complaints, there "likely" was "some kernel of truth to the idea that there" were "some acquired neuropsychological difficulties from . . . the accident." Tr. 353-55.

With respect to actual mental functional capabilities, Dr. Lewy testified that he agreed plaintiff had "the capacity to perform routine, [repetitive and] familiar, two to three-step tasks with moderate ease." Tr. 356.  He did not agree, however, that plaintiff had marked difficulties in his ability to function socially, finding no support or basis therefor in the record. Id.  Rather, Dr. Lewy testified that plaintiff would be limited to only "[o]ccasional co-worker contact," and that he "probably would do best working away from hazards." Id.

Plaintiff argues that although the ALJ professed to agree with at least some of Dr. Lewy's testimony, including his testimony regarding plaintiff's limitations in social functioning, the ALJ disregarded those limitations without explanation.  The undersigned agrees.  With respect to Dr. Lewy's testimony on this issue, the ALJ found in relevant part as follows:

> In social functioning, the claimant has moderate difficulties.  Dr. Lewy opined that the record did not support greater limitations, and noted that the claimant has been consistently appropriate in interpersonal encounters.  His opinion is supported by the fact that numerous medical providers note the claimant to be

REPORT AND RECOMMENDATION - 7

pleasant, social, and appropriate (*see, e.g.,* Exs. 5F, 10F, 11F, and 17F).  In addition, the record contains numerous references to the claimant's friendships and relationships with his family members, with whom he appears to have appropriate relationships.

Tr. 23.  While these findings were made at step two of the sequential disability evaluation process – where functional limitations generally are described in terms of none, mild, moderate, and marked – the ALJ did not address, or state any reason for not including in his assessment of plaintiff's RFC, the more specific, moderate limitation represented by Dr. Lewy's restriction to only occasional co-worker contact. See Tr. 23-31.  As such, the ALJ erred.

> C.    Dr. Peterson

Plaintiff was evaluated by J. Keith Peterson, Ph.D., in late July 2007, who diagnosed him with cannabis abuse with possible dependence, an anxiety disorder not otherwise specified, possible depression features, and borderline intellectual functioning. Tr. 274.  Plaintiff also was assessed with a GAF score of 45, both currently and the highest in the past year. Id.  In addition, Dr. Peterson opined in relevant part as follows:

> Given the information that I have, it would appear that this claimant has very chronic cognitive and emotional difficulties. . . . I suspect that the claimant had severe cognitive difficulties that predated the MVA . . . These may have been exacerbated by the MVA . . . Perhaps he was able to use his advanced mechanical skills to compensate for his other cognitive deficits prior to his accident and that, for multiple and complex reasons, these strategies are not available to him now.  He deals with his anxiety disorder with rather extreme avoidance behavior, and the avoidance behavior will be an obstacle to seeking and maintaining work.  I suspect that he may have more problems with discouragement and depression than he divulged.
>
> Regarding the issue of this claimant's ability to work, memory testing . . . and perhaps a Test of Malingering might be helpful.  If these have already been done, those findings should be taken into consideration. . . . This claimant has poor hygiene and is a very vague reporter of his internal states, which will be obstacles to the social situations he will encounter at work.  He had trouble with directions, and his verbal behavior was quite rambling.  Unfortunately, the above pattern of cognitive and emotional difficulties appears to be rather chronic.  With the information that I have (given that I recommended the

REPORT AND RECOMMENDATION - 8

additional tests above) I would say the chances of this claimant being able to hold down even an entry-level job would be rather marginal.

Tr. 274-75.

At the same time, Dr. Peterson completed a medical source statement of mental ability to do work-related activities form, in which he indicated plaintiff had an extreme (i.e., a "major limitation" with "no useful ability to function") limitation in his ability to make judgments on simple work-related decisions, marked (i.e., a "serious limitation" with "a substantial loss in the ability to effectively function") limitations in his ability to understand, remember and carry out complex instructions, make judgments on complex work-related decisions and interact appropriately with the public, and a moderate (i.e., "more than a slight limitation . . . but the individual is still able to function satisfactorily") limitation in his ability to carry out simple instructions and respond appropriately to usual work situations and to changes in a routine work setting. Tr. 276, 278. Dr. Peterson also found that plaintiff seemed to be "impaired in all cognitive areas," that the above limitations were first noted to be present in "perhaps 2001," that cannabis abuse/dependence was "likely to contribute to his avoidance behaviors," and that abstinence was "not likely to help much." Tr. 278.

With respect to Dr. Peterson's findings and opinions, the ALJ found as follows:

I do not afford great weight to the opinion of Dr. Peterson, who stated that based on the information he had, he believed that the chances of the claimant being able to hold a job were rather marginal (Ex. 17F/6). Dr. Peterson completed a medical source statement in which he checked boxes assessing the claimant's functional limitations. His assessment regarding the claimant's cognitive functioning is consistent with the residual functional capacity found in this decision (Ex. 17F/9); however, I note that in support of his assessed limitations, he cited interview data from the evaluation, but also stated that he did not consider the claimant a good historian, based on inconsistencies in his responses and his limited self-disclosure. Given the documented credibility concerns discussed above, any limitations based on the claimant's self-reports are not well supported and are not given great weight.

REPORT AND RECOMMENDATION - 9

Tr. 30.  Plaintiff argues the ALJ's stated reasons for rejecting the above findings and opinions are not legitimate.  The undersigned agrees.

First, although the ALJ noted it, he did not give any reason for rejecting Dr. Peterson's opinion that plaintiff's chances of being able to hold a job were rather marginal contained in the written evaluation report.  Second, while the ALJ stated he found the cognitive limitations Dr. Peterson noted on the medical source statement form to be consistent with the RFC with which he assessed plaintiff, clearly the moderate limitation on the ability to respond appropriately to usual work situations and to changes in a routine work setting were not included therein.  See Tr. 23, 278.  Lastly, it may be true that Dr. Peterson both based his findings and opinions to some extent on plaintiff's self-reports and did not consider him to be a good historian, but nothing in the record indicates Dr. Peterson was unable to account for that latter fact.

Indeed, the fact that Dr. Peterson did note the inconsistencies in plaintiff's responses and his limited self-disclosure would tend to add to the credibility of his findings and opinions, as he was aware of those issues when he wrote his evaluation report.  It is true that a medical opinion premised to a large extent on a claimant's subjective complaints may be discounted where the record supports the ALJ in discounting the claimant's credibility.  See Tonapetyan, 242 F.3d at 1149; Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  It also is the case in this matter that plaintiff has not challenged the ALJ's adverse credibility determination.  See Tr. 25.

The ALJ, however, does not indicate what limitations found by Dr. Peterson he feels were based on plaintiff's subjective complaints, and thus deserving of less weight.  Indeed, there is nothing in either the medical source statement form or the evaluation report itself to indicate to what extent Dr. Peterson based his findings and opinions on those complaints.  The undersigned

REPORT AND RECOMMENDATION - 10

notes, furthermore, that Dr. Peterson also performed a mental status examination of plaintiff (see Tr. 272-74), which in itself provides a valid basis for making a medical or psychological opinion. See Clester v. Apfel, 70 F.Supp.2d 985, 990 (S.D. Iowa 1999) (mental status examination results provide basis for diagnosis of psychiatric disorder, just as physical examination results provide basis for diagnosis of physical illness or injury).

D.   Dr. Washburn

A psychological evaluation of plaintiff was performed in late August 2007, by Richard W. Washburn, Ph.D., who gave the following diagnoses: a cognitive disorder not otherwise specified; a learning disorder not otherwise specified by history; an adjustment disorder with depressed and anxious mood; and a rule out chronic post traumatic stress disorder ("PTSD"). Tr. 285.  In addition, Dr. Washburn assessed plaintiff with both a current and past year GAF score of 50.[4] Id.  In terms of prognosis, Dr. Washburn opined that:

> . . . Based upon the information available it appears that Mr. Brown has a lifelong learning disability that limits his reading ability and probably his spelling and math abilities.  In spite of his learning difficulties, he was able to learn some useful work skills and was apparently employed at Boeing for an extended period of time until his motor vehicle accident.  Very likely his duties were repetitive and relatively uncomplicated and he has no history of other employment.
>
> The background information furnished with this referral does contain evidence of positive neurological findings and balance-related test findings that are consistent with his complains [sic] of headaches and dizziness.  These findings were the basis for a diagnosis of post concussive syndrome.  He was additionally diagnosed with a major affective disorder and PTSD.
>
> If these assumptions are correct, we now have a situation in which an individual with significant limitations, to begin with, has additional difficulties in the form of dizziness and headaches as well as some memory

---

[4] As noted above, "[a] GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta, 500 F.3d at 1076 n.1 (quoting DSM-IV-TR at 34); see also England, 490 F.3d at 1023 n.8 (GAF score of 50 reflects serious limitations in individual's general ability to perform basic tasks of daily life).

REPORT AND RECOMMENDATION - 11

deficits indicated by the current testing.  There is also likely to be some
emotional overlay related to whatever feelings he might have regarding the
loss of his long-term employment. . . .

. . . It is speculative, but with a history of only one employer, he may be
lacking in job findings skills as well as having some apprehension about
learning new employment skills.  This speculation is offered as a possible
explanation for any attempt he may have made to exaggerate his symptoms
and present to examiners in markedly different ways so that someone will
recognize he has a disability.  His tendency to exaggerate makes it difficult to
determine if his complaints of nightmares and flashbacks actually interfere
with his ability to function in a workplace. . . .

A previous examiner is probably correct in assuming that Mr. Brown is more
intelligent than his intelligence test indicate.  This does not preclude a finding
that Mr. Brown likely has a learning disability and significant impairments in
his auditory concentration, as well as his ability to recall both narrative and
visual details.

Tr. 286.  In terms of plaintiff's ability to make occupational adjustments, Dr. Washburn further

opined that he did "not appear to have the cognitive ability to function adequately in full time,

gainful employment" at the time, but that it remained "to be seen whether or not rehabilitation

services might be able to find him employment compatible with his identified memory deficits,

slow motor performance and poor reading skills." Id.

In early September 2007, Dr. Washburn completed a medical source statement of ability

to do mental work-related activities, in which he found plaintiff to be markedly limited in his

ability to understand, remember and carry out complex instructions, and in his ability to make

judgments in complex work-related decisions. Tr. 288.  Dr. Washburn also commented that he

had "[p]oor recall of narrative and visual details" and "[p]oor reading ability," that he was "likely

distracted by headaches" and that he might "not be able to engage in strenuous physical tasks

because of dizziness and poor balance." Id.

The ALJ addressed the findings and opinions of Dr. Washburn as follows:

Dr. Washburn also completed a medical source statement form in which he

REPORT AND RECOMMENDATION - 12

1
2
3
4
5
6
7

opined that the claimant had mild limitations in understanding, remembering, and carrying out simple instructions and in the ability to make judgments on simple work related-decisions; he assessed marked limitations regarding the claimant's ability to perform complex tasks.  These limitations are consistent with the residual functional capacity set out above.  In addition, Dr. Washburn opined that the claimant's ability to interact appropriately with supervision, co-workers, and the public was not affected by his impairments (Ex. 18F/11). Therefore, the statement contained in Dr. Washburn's report that the claimant did not appear to have the cognitive ability to function adequately in full time, gainful employment (Ex. 18F/8) is inconsistent with the function by function assessment he performed, and is accordingly given little weight.

8
9
10
11
12

Tr. 30.  Plaintiff argues the ALJ erred in rejecting Dr. Washburn's opinion that he cannot work, asserting that (1) check box forms, of which the form Dr. Washburn completed is one, generally are given less weight than written reports, and (2) the difference in the findings contained in the written report and the check box form likely simply means Dr. Washburn did not read the form closely enough.

13
14
15
16
17
18
19
20
21
22
23

The assertion that Dr. Washburn did not read the check box form closely enough is mere speculation, as there is no indication in the record that such occurred.  It is equally, if not more, reasonable for the ALJ to have presumed Dr. Washburn had no trouble reading that form when he completed it.  See Allen, 749 F.2d at 579 (if evidence admits of more than one rational interpretation, court must uphold ALJ's determination).  In addition, although it is true that the Ninth Circuit has expressed preference for individualized medical opinions (see Murray v. Heckler, 722 F.2d 499, 501 (9th Cir. 1983), this does not mean findings and opinions contained on check box forms should be completely disregarded.  Indeed, as noted above, the check box form Dr. Washburn completed also contains written findings.

24
25
26

Given the Ninth Circuit's preference for individualized written medical opinions, though, the ALJ provided insufficient reasons for giving greater weight to the check box form completed by Dr. Washburn than to Dr. Washburn's narrative report.  The limitations set forth on the check

REPORT AND RECOMMENDATION - 13

box form, furthermore, do not necessarily correspond exactly to those discussed in the narrative report, and therefore it is not entirely clear the less severe limitations contained on the check box form are inconsistent with the disability finding contained in the narrative report.  Thus, remand for further consideration of this evidence is warranted.

II.    The ALJ's Step Two Analysis

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." 20 C.F.R. § 404.1520.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff has the burden of proving that his "impairments or their symptoms affect his ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).  The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims.  Smolen, 80 F.3d at 1290.

As noted above, the ALJ found plaintiff had severe impairments consisting of an organic mental impairment with a history of learning difficulties and dyslexia and marijuana abuse. Tr. 18.  The ALJ also found plaintiff's alleged headaches and vertigo to be non-severe impairments, as neither condition resulted in significant limitations in plaintiff's ability to perform basic work

activities. Tr. 22.  Plaintiff disagrees with this latter finding.  Although it is not entirely clear that the substantial evidence in the record supports a finding of severity in regard to the headaches or vertigo, the undersigned finds remand for further consideration of the evidence concerning those alleged impairments is warranted.

In early December 2001, plaintiff was diagnosed with "[p]ositional vertigo more probable than not due to motor vehicle accident with whiplash type of motion [to] his head," and possible migraine headaches "more probable than not due to" the same accident. Tr. 200.  In late January 2002, plaintiff reported that his headaches were helped, but only "somewhat" by one medication he took for prophylactic therapy, which also caused alleged side effects. Tr. 197.  On the other hand, plaintiff also reported that the headaches were "gone" when he took a different medication prescribed for abortive therapy, and that his "vertiginous feelings" were "better". Id.  Largely the same reports were made in early March 2002. Tr. 194.

In early April 2002, plaintiff was noted to have no vertigo or disequilibrium with activity. Tr. 176.  In early May 2002, plaintiff was reported to have "responded well" to yet another headache medication, which he was "tolerating . . . without any problems," and plaintiff himself stated that his headaches were "much less frequent and less severe," noting further that while they occurred "maybe about once a week," they were "mild and tolerable." Tr.  192.  Vertigo and disequilibrium were "provoked" with movement  during a physical therapy session in late May 2002. Tr. 170.  In late June 2002, plaintiff's "[i]nitial headache complaints" were reported to have "significantly improved," which plaintiff attributed "to 'eating more.'" Tr. 169.  In late July 2002, plaintiff was noted to be "clinically progressing with decreased 'dizziness' and improved balance during [physical therapy] exercises." Tr. 168.

In early August 2002, plaintiff reported that vestibular rehabiliation for his vertigo and

REPORT AND RECOMMENDATION - 15

the medication he took as abortive therapy for his headaches had helped. Tr. 190.  In late August

2002, plaintiff's physical therapist commented as follows:

> . . . His gait skills now appear essentially normal, excepting odd patterns with
> changing speed.  He does complain of still feeling moderately off balance and
> states his balance has recovered to only – 45% of prior level, however in
> clinic he actually *ran* up the steps 2 at a time and *ran* back down step-by-step
> *without difficulty*, which seems somewhat inconsistent with [the] patient's
> complaints.

Tr. 167 (emphasis in original).  In mid-November 2002, plaintiff reported that he had been

"doing fairly well" on both the prophylactic and abortive headache medications, but that more

recently the abortive medication had "not been helping" and that he had experienced an increase

in his headaches. Tr. 189.  In early December 2002, however, plaintiff once more reported that

he had been "doing fairly well" on the same medications. Tr. 186.

In mid-January 2004, plaintiff's headaches were noted by Gary R. Schuster, M.D., to be

"intermittently present." Tr. 212.  Dr. Schuster diagnosed plaintiff with headaches and a "[s]ense

of dizziness and imbalance," but the physical examination performed at the time was essentially

normal. Tr. 219-20.  Nevertheless, Dr. Schuster opined in relevant part as follows:

> There is no question [the above diagnoses] were the consequence of [a
> concussion secondary to the] trauma [plaintiff suffered due to the 2001
> automobile accident] and were the result of that with greater medical
> probability than not.  The patient was subjected to considerable acceleration,
> deceleration forces as he was rear-ended at significant speed.  The impact
> forces from this trauma were more than enough to have accounted for the
> development of his head injuries.  The medical literature is very clear,
> standard textbooks in neurology, as well as the head trauma literature . . .
>
> . . .
>
> These authors point out that individuals do not require a loss of consciousness
> to sustain a concussion. . . .
>
> Objectification of this patient's injuries in terms of the closed-head injury as
> far as memory dysfunction, could be obtained by formal neuropsychiatric
> testing, but at this point it is not likely to cause any additional therapies to

REPORT AND RECOMMENDATION - 16

benefit him.  It would certainly not change his prognosis.

Tr. 221.  In terms of that prognosis, Dr. Schuster continued in relevant part:

> This is based on the medical literature . . . and additional references can be supplied.  Individuals who remain symptomatic at over one year out from their trauma will continue to have persistent problems which are considered permanent in nature, which is the case for this patient.
>
> The patient's status is currently fixed and stable.  No additional treatment would be of benefit to him, with the exception that the use of anti-migraine medications should be continued if they are beneficial. . . .

Tr. 222.

The ALJ gave Dr. Schuster's opinion "very little weight," noting that his "findings on physical examination were relatively benign," that there was "no objective evidence of record to support the diagnosis of a concussion aside from the journal articles cited by Dr. Schuster," and that "the evaluation was performed in preparation for personal injury litigation." Tr. 21.  While this last reason lacks legitimacy, the first two provided by the ALJ are valid. See Lester, 81 F.3d at 832 (holding that absent evidence of improprieties, purpose for which medical report is obtained is not legitimate basis for rejecting it); Batson, 359 F.3d at 1195 (ALJ need not accept opinion of even treating physician if it is inadequately supported by clinical findings).

Plaintiff argues that a review of Dr. Schuster's report reveals he relied on a great deal of objective evidence by thoroughly reviewing his long medical history.  Nothing in that history, however, mentions either a concussion or a "[p]ost-concussive syndrome" resulting in headaches or vertigo. See Tr. 212-20.  In addition, any statements plaintiff made to Dr. Schuster concerning his medical history, and certainly any of plaintiff's statements regarding his own symptoms, also do not constitute objective medical evidence. See Tr. 212-13; 20 C.F.R. § 404.1529(a).  Plaintiff further argues Dr. Schuster's reference to research journal articles is a legitimate explanation for his symptoms.  But plaintiff cites to no legal authority, nor is the undersigned aware of any, that

REPORT AND RECOMMENDATION - 17

equates research journal articles with objective medical evidence.  As such, the ALJ was not remiss in placing greater weight on the "relatively benign" physical clinical findings obtained by Dr. Schuster at the time of the examination.

In early October 2004, Dr. Schuster stated that plaintiff was "still having headaches" along with other mental problems, stating further that "[b]ased on his current status," he did not feel plaintiff could "return to the workforce." Tr. 267.  But Dr. Schuster did not provide or cite to any objective medical evidence or clinical findings in support of his opinion, and thus the ALJ would not necessarily be required to adopt it.  Although plaintiff complained of some dizziness during an evaluation performed by Howard Quint, M.D., in early March 2005, he largely was able to perform the physical examination without such complaints. See Tr. 233-35.  Dr. Quint nevertheless provided the following assessment of plaintiff's ability to function:

> . . . He can stand and/or walk about six hours in an eight-hour workday.  He is limited by headaches and dizziness.  He can sit for six hours in an eight-hour day.  He does not use any assistive devices.  The amount of weight he can lift or carry frequently is 10 pounds and 20 pounds occasionally.  He is limited by headaches and dizziness.  He has occasional postural limitations because of some dizziness, which may be benign postural vertigo.  He may have difficulty climbing or balancing at times.  He should be able to do these for short amounts of time though.  He has no manipulative limitations.  He may have some environmental restrictions driving if he has dizziness.

Tr. 236.

The ALJ declined to give Dr. Quint's opinion regarding plaintiff's ability to work great weight, finding that "it only equivocally stated that" plaintiff "'could' have tension headaches," that there was "no support for a diagnosis of degenerative disc disease" and that "[t]he medical evidence of record" was "not supportive of a limitation to light work" as found by Dr. Quint or of "the existence of any significant physical limitations" for that matter. Tr. 22.  The undersigned finds, however, that the ALJ erred in rejecting that opinion.  For one, in terms of headaches, Dr.

REPORT AND RECOMMENDATION - 18

Quint stated both that plaintiff had headaches <u>and</u> that "[[h]e also may have tension headaches." Tr. 236.  Thus, Dr. Quint clearly opined that plaintiff had headaches of some sort.  Further, while it may be – although the undersigned does not necessarily find here – that the objective evidence in the record fails to support a diagnosis of degenerative disc disease, that absence would seem to be of little relevance to the issue of plaintiff's alleged headaches and vertigo.

During a psychological evaluation performed in mid-March 2005, plaintiff was observed "[a]t no time . . . to be dizzy." Tr. 240.  He also was observed to have "ambulated without difficulty" or "evidence of balance problems." <u>Id.</u>  In late December 2005, while Dr. Schuster stated that plaintiff continued to have "quite significant" headaches, again no clinical findings were provided to support that statement. Tr. 266.

In early April 2007, Dr. Schuster wrote a letter to plaintiff's attorney, in which he stated plaintiff had "chronic headaches and vertigo. Tr. 248.  Dr. Schuster also opined that "based on residuals of his post-concussive syndrome, imbalance, dizziness, alteration in gait, chronic headaches and vertigo," plaintiff was "medically disabled and impaired and not able to currently return to the work force in the present condition." Tr. 249.  The ALJ rejected Dr. Schuster's early April 2007 opinion that plaintiff was disabled for the following reasons:

> His conclusory statement of disability is not supported by his records, which indicate that he primarily treated the claimant for hypertension and high cholesterol (Ex. 16F).  In addition, as discussed above, the claimant's alleged headaches were responsive to medication, which he chose not to take.  Further, Dr. Schuster is the only source to note gait alteration, and even he stated that the claimant's gait was "slightly ataxic," although other sources have noted normal gait (Exs. 4F/4 and 10F/3).  Given the inconsistencies and the lack of objective evidence to support Dr. Schuster's opinion, it is not accorded great weight.

Tr. 21.  These are all legitimate reasons and, as discussed herein, are supported by the substantial evidence in the record.

REPORT AND RECOMMENDATION - 19

It is true that in early September 2007, Dr. Washburn stated plaintiff "[l]ikely" would be "distracted by headaches," and might "not be able to engage in strenuous physical tasks because of dizziness and poor balance." Tr. 288.  Dr. Washburn, however, provided no clinical findings to support this statement, and thus it appears to be based solely on plaintiff's own self-report.  As such, it is not at all clear the ALJ would have been required to adopt it, especially given the fact that the ALJ determined plaintiff to be not fully credible, a determination which plaintiff has not challenged. See Tonapetyan, 242 F.3d at 1149 (ALJ may disregard medical opinion premised on claimant's complaints where record supports ALJ in discounting claimant's credibility); see also Morgan, 169 F.3d 595, 601 (9th Cir. 1999).  Nevertheless, in light of the fact that the ALJ did not address this most recent opinion regarding plaintiff's headaches and vertigo, and the ALJ's error in evaluating the functional assessment provided by Dr. Quint, remand for re-consideration at step two of the sequential disability evaluation process is appropriate.

III.    The ALJ's Step Five Determination

If the claimant cannot perform his or her past relevant work at step four of the disability evaluation process, at step five, the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520(d)-(e).  There are two ways that the ALJ can to this: "(a) by the testimony of a vocational expert, or (b) by reference to the [Commissioner's] Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2" (the "Grids"). Tackett, 180 F.3d at 1100-1101 (emphasis in original); see also Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  The ALJ's ability to rely on the Grids is limited, however, as noted by the Ninth Circuit in describing their purpose and function:

> In some cases, it is appropriate for the ALJ to rely on the Medical-Vocational Guidelines to determine whether a claimant can perform some work that

REPORT AND RECOMMENDATION - 20

exists in "significant numbers" in the national economy.  The Medical-Vocational Guidelines are a matrix system for handling claims that involve substantially uniform levels of impairment. . . .

The Guidelines present, in *table form*, a short-hand method for determining the availability and numbers of suitable jobs for a claimant.  These tables are commonly known as "the grids."  The grids categorize jobs by their physical-exertional requirements and consist of three separate tables-one for each category: "[m]aximum sustained work capacity limited to sedentary work," "[m]aximum sustained work capacity limited to light work," and "[m]aximum sustained work capacity limited to medium work."[5] . . . Each grid presents various combinations of factors relevant to a claimant's ability to find work. The factors in the grids are the claimant's age, education, and work experience.  For each combination of these factors, . . . the grids direct a finding of either "disabled" or "not disabled" based on the number of jobs in the national economy in that category of physical-exertional requirements.

This approach allows the Commissioner to streamline the administrative process and encourages uniform treatment of claims. . . .

The Commissioner's need for efficiency justifies use of the grids at step five where they completely and accurately represent a claimant's limitations. . . . In other words, a claimant must be able to perform the full range of jobs in a given category, i.e., sedentary work, light work, or medium work.

Tackett, 180 F.3d at 1101 (emphasis in original) (internal citations and footnote omitted).

If, on the other hand, a claimant has "significant non-exertional impairments," those impairments "may make reliance on the grids inappropriate."[6] Id. at 1101-02; Osenbrock, 240 F.3d at 1162; Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (Grids inapplicable when they do not completely describe claimant's abilities and limitations).  Proper use of the Grids depends in each case on the nature and extent of the claimant's impairments and limitations:

The ALJ must apply the grids if a claimant suffers only from an exertional impairment . . . In such cases, the rule is simple: the grids provide the answer. Where the grids dictate a finding of disability, the claimant is eligible for

---

[5] However, "[I]f a claimant is found able to work the full range of heavy work this is 'generally sufficient for a finding of not disabled.'" Tackett, 180 F.3d at 1101 n.5 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 204.00).

[6] "Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b).  "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).

REPORT AND RECOMMENDATION - 21

benefits; where the grids indicate that the claimant is not disabled, benefits may not be awarded. *However, where a claimant suffers solely from a nonexertional impairment . . . the grids do not resolve the disability question . . . other testimony is required.* In cases where the claimant suffers from both exertional and nonexertional impairments, the situation is more complicated. First, the grids must be consulted to determine whether a finding of disability can be based on the exertional impairments alone. . . . If so, then benefits must be awarded. However, if the exertional impairments alone are insufficient to direct a conclusion of disability, then further evidence and analysis are required. In such cases, the ALJ must use the grids as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." . . . In short, the grids serve as a ceiling and the ALJ must examine independently the additional adverse consequences resulting from the nonexertionary impairment.

Cooper v. Sullivan, 880 F.2d 1152, 1155-56 (9th Cir. 1989) (emphasis added) (internal citations and footnotes omitted).

As pointed out by plaintiff, the only severe impairments the ALJ found he had consisted of an organic mental impairment with a childhood history of learning difficulties and dyslexia, as well as marijuana abuse. Tr. 18.  Accordingly, plaintiff argues, and the undersigned agrees, that the ALJ could not properly rely on the Grids to find plaintiff not disabled, but rather the ALJ should have obtained the testimony of a vocational expert.  In addition, as noted above, the Grids may be used only if they "*completely and accurately* represent a claimant's limitations." Tackett, 180 F.3d at 1101 (emphasis in original).

That is, the claimant "must be able to perform the *full range* of jobs in a given category." Id. (emphasis in original).  If the claimant "has significant non-exertional impairments," however, reliance on the Grids is not appropriate. Ostenbrock, 240 F.3d at 1162; Tackett, 180 F.3d at 1102 (non-exertional impairment, if sufficiently severe, may limit claimant's functional capacity in ways not contemplated by Grids).  Given that, as discussed above, the ALJ erred in evaluating the medical evidence in the record, and that, also as discussed above, issues remain as

REPORT AND RECOMMENDATION - 22

to the severity of plaintiff's alleged headaches and vertigo, it is unclear whether plaintiff suffers

from other significant non-exertional limitations making application of the Grids inappropriate

for this reason as well.

IV.     Development of the Evidentiary Record

        The ALJ has the duty "to fully and fairly develop the record and to assure that the

claimant's interests are considered." Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001)

(citations omitted).  However, it is only where the record contains "[a]mbiguous evidence" or the

ALJ has found "the record is inadequate to allow for proper evaluation of the evidence," that the

ALJ's duty to "conduct an appropriate inquiry" is triggered. Id. (citations omitted); Mayes v.

Massanari, 276 F.3d 453, 459 (9th Cir. 2001).  Plaintiff argues the ALJ erred in failing to carry

out his duty to develop the record here.  The undersigned agrees in part.

        Specifically, plaintiff points to the following sequence of testimony at the second hearing

to argue the ALJ should have obtained his employment records from Boeing:

> ALJ:    -- is Mr. Brown's earning records, because his earnings have
> been very steady.  He's made as much as $50,000 a year.  And his current
> situation is somewhat inexplicable to me, even after the testimony of Dr.
> Lewy.  And it's unfortunate that his prior employer is Boeing, because they're
> extremely --
> ATTY:   Uh-huh.
> ALJ:    -- unresponsive.  But I would suggest that you might, while
> you're doing your brief, see if you can get Boeing to be forthcoming with any
> kind of paperwork explaining the circumstances under which Mr. Brown left.
> Because I'm not entirely sure --
> ATTY:   I can try.
> ALJ:    -- about the face value of his effort.  I have subpoenaed
> material from them in the past and still don't have it.
> CLMT:   Why?
> ALJ:    So maybe the two of you could go up there together --
> ATTY:   Uh-huh.
> ALJ:    -- and ask them to give him their file.
> CLMT:   Excuse me, Your Honor.  I didn't mean to laugh, it's,
> Boeing's is not going to give up anything to anybody, even if I went.  Because
> I had --

REPORT AND RECOMMENDATION - 23

ALJ:      Because?

CLMT:     -- to go back and tried to get something from them, and I believe it's a paper that I might have brought to you.  But it took them two years just to give me the piece of paper just stating that I did work for them, and it was something else on it, and that's about it.  It took them two years to give me that.

ALJ:      Well, the last time I tried to sic the U.S. Attorney on someone to get some material, that took two years. So --

ATTY:     So you're proposing an impossible task?

ALJ:      I may be.

ATTY:     I'll see what I can do.

ALJ:      But I think we should investigate it, because that's the overwhelmingly huge question --

ATTY:     Uh-huh.

ALJ:      -- in this case.

ATTY:     Okay.  I mean, I, I would suggest that the fact that Mr. Brown did have a fairly long and successful work history that very abruptly ended with his accident is, it sort of validates his, his --

ALJ:      Well, I don't believe in --

ATTY:     Clearly this is a man who liked to work.

ALJ:      -- res ipso locator, so, because there could be other issues lurking around here somewhere, including drug testing on the job, which is totally hypothesis, but absent something from Boeing I have no way of knowing.

ATTY:     Uh-huh.

ALJ:      So, you can do your brief.  I'll ask you to see if you can get some material.  If you don't, I may explore the issue of subpoenaing their records.

ATTY:     Okay.

Tr. 360-61.  Plaintiff asserts the ALJ erred by then failing to make any attempt, by subpoena if necessary, to obtain his employment records.  But it is not at all clear that any attempt, even via subpoena, would have done any good.  Plaintiff himself admitted at the hearing that it took him two years just to get a piece of paper stating he worked at Boeing, and the ALJ noted that the last time he tried to get subpoenaed material – an attempt that also apparently involved the Office of the United States Attorney – it took two years as well.  Nor does it appear plaintiff or his attorney at all made any efforts to obtain the employment records, despite the ALJ's request that they do so first.  Lastly, there is no indication the record before the ALJ provided insufficient evidence

REPORT AND RECOMMENDATION - 24

upon which to base a disability decision.

Nevertheless, the undersigned does find that should the Commissioner on remand deem the Boeing employment records to be necessary in order to make a final disability determination, a reasonable attempt to obtain them should be made. Plaintiff further argues the ALJ should have obtained the testimony of a vocational expert because the ALJ found he had non-exertional impairments, which caused non-exertional limitations only. For the reasons discussed above, the undersigned agrees. Finally, plaintiff argues that although the record indicates he had undergone chiropractic treatment in 2003 (see Tr. 218-19), the ALJ did not obtain them. It is not clear what, if any, attempt the ALJ made to get that evidence. Nor is it clear whether plaintiff or his attorney also made any such attempt. To the extent records of that treatment exist, however, they do appear to constitute significant probative evidence. Thus, while the undersigned does not find any actual error on the part of the ALJ here, the Commissioner on remand shall try to obtain this evidence as well.

V.      This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan

REPORT AND RECOMMENDATION - 25

v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, they should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).

Because issues still remain with respect to the medical evidence in the record, the severity of

plaintiff's alleged headaches and vertigo, plaintiff's residual functional capacity, and his ability

to perform other jobs existing in significant numbers in the national economy, this matter should

be remanded to the Commissioner for further administrative proceedings.

<u>CONCLUSION</u>

Based on the above discussion, the Court should find the ALJ improperly concluded

plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the

for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.")

72(b), the parties shall have **fourteen (14) days** from service of this Report and

Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file

objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474

U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is

directed set this matter for consideration on **April 23, 2010**, as noted in the caption.

DATED this 30th day of March, 2010.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 26